CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

MAYA KARWANDE (CABN 295554)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7236
    Maya.Karwande@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:23-CR-00387-JST |
| Plaintiff, | **UNITED STATES CORRECTED[1] SENTENCING MEMORANDUM** |
| v. | Judge: Hon. Jon S. Tigar |
| MARK PIKE, | Sentencing Date: February 27, 2026 |
| Defendant. | Time: 9:30 a.m. |

## I.    INTRODUCTION

Mark Pike, a career offender with a history of brutal violence against women, deals large quantities of methamphetamine and fentanyl in Contra Costa County.  In April 2022, Pike was paroled after serving a ten-year sentence for hitting his ex-girlfriend on the head with a steel pipe and choking her with a bike lock cable.  Pike returned to methamphetamine trafficking while armed with a loaded semiautomatic handgun. Over the next year and half, Pike was arrested four times. Each time, Pike

---

[1] The United States files this sentencing memo to correct typos (an extra zero) in its previously filed memorandum that led to inaccuracies in regard to the number of potentially deadly fentanyl doses Pike possessed.  The government has also added a citation regarding 2 mg of fentanyl being a potentially deadly dose.  The government also corrected the amount of methamphetamine doses Pike possessed on October 12, 2022 to be consistent with the net weight of the methamphetamine rather than gross weight.  Corrections were made on page 3, line 27, page 4, line 20-21, page 5, line 8, and page 11, lines 7-8.

possessed distribution quantities of methamphetamine and/or fentanyl.

In November 2023, Pike was arrested on the federal Indictment. In April 2024, Pike was released pretrial due to medical issues.  Instead of getting treatment, Pike continued dealing large quantities of methamphetamine while on home detention.

Pike's criminal conduct has not been deterred by a prior 10 year state prison sentence, by being on parole, by having his parole revoked, by being arrested by state authorities, by being arrested by federal authorities, by being subject to a suspicionless search clause, by being frequently searched and having his drugs and firearms seized, by being on federal pretrial release, by being on home detention, by being on location monitoring, by receiving drug addiction treatment, or by his medical conditions. Pike's conduct on pretrial release demonstrates that he will take advantage of any leniency afforded to him to continue trafficking methamphetamine.  Pike is a danger to the community and must be stopped. A *substantial* prison sentence is necessary to ensure Pike does not continue to traffic large quantities of methamphetamine and fentanyl, possess firearms, or abuse women.

Considering the nature of the conduct, the need to protect the community, and the defendant's nature and characteristics, the government respectfully recommends a below Guidelines sentence of 232 months' custody followed by 4 years' supervised release with an expanded search condition and forfeiture.

## II.    PROCEDURAL POSTURE

On October 25, 2023, the Grand Jury returned a single count Indictment charging Pike with one violation of 21 U.S.C. § 841(a)(1) and (B)(1)(B)(viii) - Possession with Intent to Distribute 50 grams or more of a Mixture and Substance Containing a Detectable Amount of Methamphetamine. On November 21, 2025, Pike pleaded open to the charge.

## III.    FACTUAL BACKGROUND

**A.    Pike serves 10-year sentence for domestic violence assault, is paroled, and within months has a gun and is trafficking methamphetamine and fentanyl**

On April 1, 2022, Pike was released from the California Department of Corrections (CDC) and Rehabilitation on parole after serving a 10-year sentence for a brutal assault on his ex-girlfriend. PSR ¶ 12. As a condition of Pike's parole, he was subject to a warrantless CDC parole search condition.

Parole search conditions are meant to deter parolees from engaging in criminal conduct. As a condition of Parole, Pike was also supposed to enroll in and successfully complete a substance abuse treatment program.  MP-00285

CCCSO Violence Suppression Unit (VSU) kept tabs on Pike and knew he was living on Enes Avenue in Bay Point where his brother has a house.  MP-00123.  Six months after Pike was paroled, on October 5, 2022, detectives from the CCCSO Violence Suppression Unit (VSU) were conducting surveillance on Pike's Enes address. *Id.* VSU Detectives observed Pike exit his house, go up to a SUV, hand something to someone in the passenger seat of the SUV, and then go back to his house. *Id.* Because it appeared Pike had just done a hand-to-hand drug deal, VSU detectives followed the SUV, conducted a traffic enforcement stop, searched the SUV, and recovered ½ ounce of methamphetamine from the person in the front passenger seat. *Id.*

On October 12, 2022, CCCSO conducted a parole search on Pike's person, vehicle, and residence. PSR ¶ 13. Deputies initially stopped Pike as he was driving and searched his vehicle and person. *Id.* Deputies found $1,370 cash in Pike's pocket.  Deputies told Pike they were going to search his house. *Id.* Pike became nervous and agitated and said he just stayed there sometimes.  *Id.* Deputies arrived at the house, announced themselves, and demanded entry for a parole search.  *Id.*  After 30 seconds, three women exited the house and were detained during the search. *Id.*

Deputies found indicia that Pike lived there, including a sports jersey with Pike's name, a framed photo, and a diploma, in plain view. *Id.* On top of the dresser was a scale, credit cards, and methamphetamine strewn about a glass mirror in a manner consistent with use. MP-00107 (Photo 21). Inside the dresser, deputies found one zip-lock bag of blue methamphetamine, sandwich bags that are often used for narcotics packaging, and a digital scale. Next to the dresser, inside a Dewalt "engine start" box, was approximately two pounds of methamphetamine wrapped in two bags.  PSR ¶ 13. In total, deputies recovered approximately 3.5 pounds of methamphetamine and 10 grams of suspected heroin. DEA lab testing revealed that the methamphetamine was 95% pure with a net weight of 1,421 grams (3.1 pounds) pure methamphetamine. *Id.* The suspected heroin was also sent to the DEA laboratory but has not yet been tested or weighed due to a backlog reduction initiative. *Id.*

An individual dose of crystal methamphetamine is approximately one tenth of a gram.  MP-

00100. The amount of methamphetamine located in Pike's bedroom translates to 14,210 individual doses of methamphetamine. *Id.*

The three women at Pike's house were interviewed. PSR ¶ 13. All women confirmed that Pike lived there and denied knowing of the large quantities of methamphetamine. *Id.* The women stated they were just there to hang out. *Id.*

Pike's phone was seized and searched pursuant to a warrant. In the week leading up to the search, Pike was discussing prices for different quantities of drugs with various customers. For example, Pike offered – "90 ea" for a "zip" which is a common slang for an ounce, "7 grams for 100" and "QP [quarter pound] for 400." *See* MP-00126, MP-00128. In another conversation, Pike told someone who offered to trade "blues" (fentanyl laced M30 pills) for "2 zips" to come over. MP-00128. Pike also asked for the price for a "12 gauge" firearm. MP-00127.

On December 29, 2022, CCCSO conducted another parole search at Pike's house on Enes. PSR ¶ 14. Pike was outside standing in the driveway when CCCSO deputies arrived. *Id.* When he saw them, Pike ran toward the house. *Id.* Pike was detained. *Id.* In Pike's bedroom deputies found a Glock 17 semi-automatic handgun with an extended 30-round magazine and loaded with 22 rounds of ammunition lying on the middle of the bed. *Id.* The firearm was located approximately six inches away from Pike's wallet. *Id.* On the dresser, deputies found one pound of methamphetamine, two scales, and sandwich bags. *Id.* In the freezer, deputies found fentanyl, cocaine, and suspected heroin. *Id.* All suspected drugs recovered during the search were sent to the DEA laboratory for testing. In total, deputies recovered 450 grams (or approximately 4,500 doses) of pure methamphetamine, 27.8 grams of fentanyl, and 9.2 grams of cocaine. PSR ¶ 15. Fentanyl, the most dangerous drug to impact the community in decades, can be lethal in as little as 2 milligrams (0.002 grams). *See* Drugs. Com, *Fentanyl* (last updated May 22, 2024), https://www.drugs.com/fentanyl.html (last accessed February 23, 2026); United States Drug Enforcement Administration, *One Pill Can Kill* (updated February 23, 2026), https://www.dea.gov/onepill ("2mg of fentanyl equates to a potentially deadly dose"). The fentanyl that Pike had in his bedroom is equivalent to 13,900 potentially deadly doses.

A woman, K.A. was present at Pike's house during the search. PSR ¶ 14. K.A. stated that she had been staying with Pike for a few weeks and that she thought she and Pike were dating but believed

that Pike would say they were not. *Id.* K.A. stated she saw the deputies approaching, got scared, and moved the individual bags of fentanyl and cocaine off the bed and into the freezer. *Id.* K.A. stated she did not know who the methamphetamine and handgun and other drugs belonged to, but they were not hers. *Id.*

The firearm was sent for DNA testing at the CCCSO laboratory. PSR ¶ 15. The testing of a swab from the pistol trigger revealed a DNA mixture of three individuals and provided strong support for the proposition that Pike was a contributor to the mixture. *Id.* Additional testing of the firearm demonstrated that it was a functioning firearm. PSR ¶ 15.

Pike was arrested, found to have violated parole, and was sentenced to 90 days flash incarceration.

On May 17, 2023, CCCSO VSU did another parole compliance check on Pike. PSR ¶ 16. Pike was in his purple Cadillac Escalade, with the license plate "MRPIKE" and parked outside of K.A.'s apartment complex. *Id.* CCCSO recovered 8 grams of suspected fentanyl (approximately 4,000 potentially deadly doses) tucked between the driver's seat and door of the Cadillac. *Id.* Inside K.A.'s apartment, where Pike had just left, CCCSO recovered Pike's mail in the bedroom, a scale, sandwich baggies, and three bullets. *Id.* Trying to avoid another seizure from his parole address on Enes, Pike had moved to K.A.'s apartment.

A few months later, on November 16, 2023, Pike was arrested on the federal warrant for the instant case. PSR ¶ 16. At the time of his arrest, Pike had 89 grams of methamphetamine (890 individual doses) and 25 grams of fentanyl (12,500 potentially deadly doses) in his pocket. *Id.* Pike also had $1,050 cash and three digital scales. *Id.* CCCSO then searched the residence of Pike's new girlfriend, M.L., whom he was living with at the time, and found additional methamphetamine in her purse. *Id.*

Pike's phone was searched following his federal arrest. Pike's messages confirmed that he had continued in the same pattern of drug trafficking that he had leading up to the charged offense in October 2022. For example, in November 2023, Pike tells one customer he has a "half zip," (a half ounce), he offers another "375 for 4," and he tells another, "I got good Fetti [fentanyl]" and then follows up asking, "Do u want Kris [slang for crystal methamphetamine] or the other??" *See* MP-00493, MP-00494, MP-00459, MP-00500-501. At least one woman who messages him appears to offer

a sexual relationship in exchange for user amounts of fentanyl. Pike tells the woman the beginning of the conversation, "I got a hold of some rainbow stuff [a reference to rainbow fentanyl] & they love da hell out of it." MP-00506. The woman responds, "Yeah? I'll check it out."  Later in the conversation Pike offers, "I got Iso $100 a gm or da clean $40 a gm." *See* MP-00515. "ISO" is street slang for Isotonitazene, a powerful synthetic opioid that is similar to fentanyl. *See* Drug Enforcement Administration, "ISOTONITAZENE" (December 2025) at https://www.deadiversion.usdoj.gov/drug_chem_info/isotonitazene.pdf (last accessed  February 20, 2026).  The woman asks him to come by and Pike says "I'ma bring u da clean clean cuz da iso mite have u O-D," i.e.,  Pike will bring her "clean" fentanyl for $40 because the "Iso" might make her over dose. MP-00517. The next day the woman messages him again.  Pike offers that they could meet up, "but my hands can't stay still they disobeyish." MP-00523. She replies, "lol mind over body, or don't cheat yourself treat yourself lol.  I can get some stuff from you too." *Id.*   Pike says he will come by.  In another conversation, a woman is trying to get in touch with Pike to get drugs for herself and other customers. Pike is not consistently responding so she sends him an explicit photo with the message, "can u all me back please I'm almost broke I need work."  MP-00530-541.

**B.    Pike is charged with the instant federal offense, released pretrial for medical treatment, and delays treatment while continuing to traffic methamphetamine**

After a series of detention hearings in November 2023 and January 2024, Judge Westmore was about to issue an order detaining Pike pretrial. Pike then had a seizure during court.  Pike was in custody until April 23, 2024, when he was released back to his brother's house on Enes to facilitate medical care for tumors in his neck and back. PSR ¶ 4.  In addition to tumors in his neck, back and chest, Pike has diabetes.  Diabetic seizures can be triggered when a person's blood sugar gets too low or too high.[2]  Pike was released on various conditions, including home detention (but without an ankle monitor so as not to interfere with his medical treatment) and outpatient drug addiction treatment.

Pike violated the location monitoring conditions in July, August, and September 2024 and also failed to attend group counseling sessions in September and October 2024.  PSR ¶¶ 5,6.  In September

---

[2] Cleveland Clinic, "Diabetes-Related Seizure," December 16, 2025 https://my.clevelandclinic.org/health/diseases/diabetic-seizure  (last accessed February 20, 2026).

2024, Pike's brother sought to be removed as Pike's custodian and, over the government's objection, Pike moved in with M.L., his girlfriend, and she became his custodian. ECF 47. Pike admitted to prior methamphetamine use and on November 5, 2024, Judge Westmore ordered Pike to attend New Bridge residential treatment.

Between April 2024 – November 2024, Pike did not report any medical episodes or seizures to Pretrial Services. Pike had a surgery scheduled to remove his thyroid and chest tumors in October 2024, but it was cancelled because he was not "feeling it." PSR ¶ 8; 2024.10.16 Medical Records at 2. Pike also reported that he had stopped taking his diabetes medication but was going to start it again. *Id.*

Pike entered New Bridge residential treatment in November 2024 and reportedly visited the emergency room multiple times while there. PSR ¶ 7. Pike had a seizure during a group session on December 12, 2024, and was transported to the hospital in an ambulance. PSR ¶ 7. Because of Pike's seizures, he was terminated from New Bridge and ordered to return home. *Id.* On December 17, 2024, a bond hearing was set, but Pike did not appear in court due to a medical emergency. ECF 58.

Pike was scheduled for surgery on January 21, 2025, but it was cancelled due to a positive toxicology test. PSR ¶ 8; *see* 2025.01.21 Medical Records.

On April 2, 2025, U.S. Pretrial Services submitted a violation memorandum regarding a positive methamphetamine test and a violation of the location monitoring conditions. ECF 66 and 68. On April 24, 2025, a bond hearing was scheduled to address concerns about Pike's living situation with his girlfriend, M.L. Pike again did not show up for the court hearing due to a purported medical emergency. ECF 69. Pike was referred to weekly individual and group drug addiction therapy. PSR ¶ 8. In May 2025, Pike did not participate in substance abuse treatment as directed, did not report to U.S. Pretrial Services as directed, and did not abide by the location monitoring restrictions. PSR ¶ 9. On May 20, 2025, Judge Westmore ordered Pike to participate in intensive outpatient treatment. *Id.* Aside from the incidents at Newbridge and the days Pike had Court hearings, no medical emergencies or seizures were reported to U.S. Pretrial Services from November 2024 to June 2025.

On June 18, 2025, CCCSO VSU executed a search warrant at Pike's residence. PSR ¶ 18. Pike was once again the subject of a CCCSO investigation, even while on federal pretrial release. *Id.* Pike was found sleeping in his bed. *Id.* Pike was woken up by CCCSO deputies and taken outside *Id.* Next to

USA CORRECTED SENT. MEM.                 7
4:23-CR-00387-JST

where Pike had been sleeping in his bed, CCCSO recovered live ammunition, a small scale, and plastic baggies. *Id.* CCCSO found ¾ pound of suspected methamphetamine (3,400 doses of methamphetamine) in a fridge in the closet, along with Pike's diabetes medication. *Id.* Pike had a seizure while he was outside and was arrested and transported by the fire department due to his medical issues.

On July 25, 2025, Pike was due in Court for a change of plea. Pike did not show up to Court because he reported he had a seizure that morning. ECF 85. On July 29, 2025, Pike had surgery to remove tumors in his thyroid.

On August 3, 2025, less than a week after Pike's surgery, CCCSO VSU Detective Guerreo stopped a woman for a traffic violation (expired registration) while driving Pike's purple Cadillac with the "MRPIKE" license plate. PSR ¶ 19. Detective Guerrero approached the car and overheard the woman talking on the phone with Pike. *Id.* Detective Guerrero recognized Pike's voice from numerous contacts over the years. *Id.* When initially stopped, the woman stated in response to the question of whether anything illegal was in the car, "That I don't know I can't tell you that, I borrowed the car to pick up his mail and go right back to his house because he is on house arrest." Deputy Guerrero continued to question her, and she said she was out here visiting her friend "Mark Pike" and she was checking his mail over on "Enes." But the woman was not driving in the direction of Pike's house on Enes. *Id.* Based on the woman's nervous demeanor, inconsistent story, and Detective Guerrero's knowledge of Pike's criminal history, prior arrests, and that Pike commonly used women to pick up and drop off methamphetamine for him, especially since he has been on house arrest for this federal case, the detective developed probable cause to search Pike's vehicle. *Id.* Detective Guerrero found approximately 2.5 pounds (11,339 doses worth approximately $2,500-3,500 if purchased by pound) of suspected methamphetamine in a gray bag in the back seat. *Id.* After finding the drugs, Detective Guerrero continued to question the woman. *Id.* Initially, she denied knowing about the bag in the car. *Id.* Eventually, she admitted that she had been told to go pick up the bag. *Id.*

On August 11, 2025, Pretrial Services submitted an informational memorandum regarding the June and August incidents. PSR ¶ 10. The next day Pike's bond was revoked, and he was remanded to custody. *Id.* On November 21, 2025, Pike pleaded open to the charge in the Indictment.

**IV.   SENTENCING GUIDELINES CALCULATION**

The government and Probation agree with the following Guidelines calculation:

a.  Base Offense Level (U.S.S.G. § 2D1.1(c)(2)):                                36
    (*At 30,000 KG but less than 90,000 KG of Converted Drug Weight*)

b.   Specific Offense Characteristics, U.S.S.G, § 2D1.1(b)(1)                   +2
(Possession of a firearm on December 22, 2022)

b.  Acceptance of Responsibility (U.S.S.G. § 3E1.1(a) and (b)):                 -3

c.  Total Offense Level                                                         35

The parties all agree with Probation's calculation of Pike's Criminal History score as 17 and his Criminal History Category VI.  PSR ¶ 53.  Pike is also a Career Offender under §4B1.1(b), further establishing his CHC as VI. An Offense Level of 35 and Criminal History Category VI results in a Guidelines range of 292-365 months imprisonment.

**B.      Base Offense Level**

Probation's calculation of the Guidelines correctly includes the December 29, 2022 and November 16, 2023 incidents as relevant conduct and relies on DEA laboratory testing for the calculation of the converted drug weights.

Pike is a methamphetamine, fentanyl, and other drug trafficker that possessed with the intent to distribute drugs while on parole and pretrial release. Beginning in at least October 12, 2022 and continuing until his arrest on the federal charge on November 16, 2023, Pike regularly possessed with the intent to distribute methamphetamine and other drugs, including on December 29, 2022 and November 16, 2023.  Accordingly, the December 29, 2022 incident and November 16, 2023 incident are part of the same "course of conduct" as the October 22, 2022 charged offense and should be included as relevant conduct.[3] *See* 1B1.3(a)(2).

The "course of conduct" analysis focuses on whether offenses are "sufficiently connected to or related to each other as to warrant the conclusion that they are part of a … ongoing series of offenses." U.S.S.G. Commentary 5(B)(ii).  Factors to consider include the "similarity of offenses, the regularity

---

[3] The government has not sought to include the May 17, 2022 8 gram fentanyl and ammunition seizure, the June 18, 2025 ¾ pound methamphetamine and ammunition seizure, or the August 3, 2025 2.5 pound methamphetamine seizure as relevant conduct only because those drugs have not yet been laboratory tested.

(repetitions of offenses), and the time interval between offenses." *Id.* The Commentary specifically notes that "in a drug distribution case, quantities and types of drugs not specific in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct. U.S.S.G § 1B1.3, comment (backg'd).

Here, the October 12, 2022 charged offense and the December 29, 2022 incidents were only two months apart, both involved Pike possessing with the intent to distribute large quantities of methamphetamine (along with baggies, digital scales, and large amounts of cash) at his house while on parole. The November 16, 2023 incident, which took place just 11 months after the December 2022 incident (and only 6 months after Pike had distribution quantities of fentanyl during a parole compliance check on May 17, 2023), Pike again had distribution quantities of methamphetamine on his person, again had a digital scale, and again had cash on his person. Searches of Pike's phone confirmed a continued course of conduct – Pike was coordinating drugs transactions in the fall of 2023 in the same manner he was in the fall of 2022 in the lead up to the charged offense. For these reasons, the December 29, 2022 and November 16, 2023 seizures should be included as relevant conduct.

Pike separately disputes Probation's reliance on the DEA laboratory testing results of the large bags of methamphetamine seized on October 12, 2022 for the Guidelines calculation. The DEA laboratory testing, which established the methamphetamine as pure rather than a mixture and substance, increased the Guidelines by two levels. The results of the laboratory testing were inadvertently produced after Pike's change of plea. While the date of disclosure does not impact the calculation of the Guidelines, to account for the date of production the government will recommend a sentence within the Guidelines range associated with total offense level 33, CHC VI.

## V.    GOVERNMENT'S SENTENCING RECOMMENDATION

### A.    Legal Standard

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. *Id.* The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S.

85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007).  After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.  Here, the most important considerations are the nature and circumstances of the offense, the history and characteristics of the defendant, the need to protect the community.  18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(6).

**B.      Nature and Circumstances of the Offense**

Drug overdoses are the leading cause of death for adults aged 25-54 in Contra Costa County. *See* Contra Costa Health, "OD Free Contra Costa," https://www.cchealth.org/health-and-safety-information/od-free-contra-costa (last accessed on February 20, 2026).  The quantity of fentanyl that Pike possessed was equivalent to 30,000 potentially lethal doses. In other words, enough to kill everyone in Bay Point (est. pop. 24,000), the area where Pike lived.  Pike knew of the dangers of the drugs he was dealing. In his messages, he told a woman that he would bring her "clean" fentanyl instead of ISO, a more expensive drug he was offering so she wouldn't "O-D."

Methamphetamine, although less immediately lethal, is highly addictive and is the second most commonly found drug in people who fatally overdose. See https://nida.nih.gov/research-topics/methamphetamine#overdose-crisis. In total, Pike possessed enough methamphetamine for 35,129 individual 1/10 of a gram doses. That is more than enough individual doses of methamphetamine for every single resident of Bay Point.

Pike's crime is serious.  And it is more so because Pike also possessed a loaded firearm.  The dangerousness of the offense and the need to deter future conduct and protect the community demand a substantial Guidelines-range sentence.

**C.      History and Characteristics of the Defendant**

**1.      Pike has a history of brutal violence against women.**

Pike is violent against women. In July 2016, Pike went over to the house of an ex-girlfriend and the mother of his then 5-month-old baby. Pike and the ex-girlfriend were intimate and then got in an argument.  While the baby was sleeping in another room, Pike hit the victim on the back of the head with a steel pipe and strangled her with a bike lock cable.  Pike then left the victim bleeding from a 2-

inch laceration in her head.  The victim attempted to follow Pike in her car but was so disoriented she crashed the car in a field. Fearing she would bleed to death, she stumbled to a residence near the crash, knocked on the door, and asked for help.  When police arrived, the victim was in and out of consciousness. The car was covered with blood from the head wound. After the incident, in recorded jail calls, Pike attempted to dissuade the victim from testifying. Pike told the victim that they would be together and asked her to say that he wasn't the one who had hurt her and that she had been coerced into identifying him.

At the same time, in a message extracted from his phone during the time period following the assault, Pike bragged about the incident: "i whopped her ass & sent her 2 da hospital." *See People v. Pike*, 2018 WL5003446 (Contra Costa County, Super Ct. No 5-161223-3) at *2 (October 16, 2018). Pike was convicted following a jury trial and sentenced to 10 years' imprisonment.

Pike's 2017 conviction is the most serious violence in his criminal record, but it is not an isolated incident. The PSR details numerous times when Pike assaulted different girlfriends but the incidents did not result in prosecutions:

- October 3, 2005: Officers arrive and Victim One is visibly upset and had bloody scratches on her face, swelling to the left side of her face, and swelling to the left side of her forehead. Victim One, who is mother of Pike's then 2-year- old daughter, says that Pike hit her in the head with an unknown object and hit her in the face several times with a closed fist (PSR ¶ 58).

- March 11, 2009: Officers are dispatched to report of woman crying.  When officers arrive Victim Two is seated on Pike's lap in a car with her feet out of the front door, naked from the waist up, crying, trying to cover herself, and Pike is pulling her hair. Victim Two has abrasions on her hand and a bump on her chin. (PSR ¶ 59).

- August 17, 2011: Officers respond to report of a restraining order violation.  Pike contacted Victim Two to discuss a financial issue.  Victim Two wanted some money back and got in the car with Pike.  Pike pulled out an 8-inch buck knife and touched the tip to her neck and said, "Bitch I will kill you right now," Pike then struck her in the right side of her face with a closed fist.  Officer observed a one centimeter long scratch and swelling on the right side of her cheek. (PSR ¶ 61).
  .
- February 6, 2014: Officers arrived at the scene and saw Victim Three with swelling and bruising to her left eye and a one-inch laceration on her eye lid. Victim Three's eye was almost completely shut and there was blood dripping from her eye.  Victim Three said that she was in an argument with Pike at his residence and he punched her in the left eye with a closed fist and then got behind the victim, put his right arm around her neck and pulled her to the ground,  Pike punched her again in the left eye and said "Fuck you bitch."  When officers went to Pike's house  it was in disarray and there was blood on the kitchen floor and on his shirt. (PSR ¶ 65).

Pike's volatility and history of violence against women is even more concerning because he regularly involves women in his drug trafficking.  While on pretrial release, CCCSO was investigating Pike's use of women to pick up and drop off drugs for him while he was on home detention. In addition, Pike's messages demonstrated that some women wanted to have relationships with him at least in part because of his access to fentanyl and methamphetamine.

### 2.    Pike has a long history of criminal conduct that has been undeterred by non-custodial interventions

Pike is a Career Offender under the United States Sentencing Guidelines.  Pike criminal history dates back to 1994 and includes state convictions for residential burglary, possession of narcotics for sale (cocaine, methamphetamine, cocaine base) and selling cocaine base.  Pike has distributed methamphetamine while in prison (PSR ¶ 67), while on parole, and while on federal pretrial release. Pike has not been deterred by any non-custodial intervention.  Pike's record on pretrial release in this federal case shows that he will take advantage of any chance to turn things around to continue to traffic methamphetamine. Pike's behavior shows a disregard for treating his medical conditions or receiving drug addiction treatment.  Despite being given every opportunity to do so, both while on parole and on pretrial release, Pike has simply returned to methamphetamine and fentanyl trafficking with increasing sophistication.

The seriousness and dangerousness of the offense together with Pike's violent history against women, his possession of firearms, and the failure of all non-custodial interventions to protect the community urge a substantial prison sentence.

//
//
//
//
//
//
//
//

## VI.    CONCLUSION

The United States respectfully requests that this Court impose a below-Guidelines sentence of 232 months' imprisonment, followed by four years' supervised release that include the expanded search condition, forfeiture of the $1,370 seized on October 12, 2022, the Glock 17 semi-automatic handgun with an extended 30 round magazine and ammunition seized on December 29, 2022, the $1050 seized on November 16, 2023 and a mandatory $100 special assessment.

DATED:    February 23, 2026                          Respectfully submitted,

                                                    CRAIG H. MISSAKIAN
                                                    United States Attorney

                                                     /s/ Maya Karwande
                                                    MAYA KARWANDE
                                                    Assistant United States Attorney